We'll proceed to the next case on our calendar. The next calendar case is Rule v. Stephanie Rule v. Andrew Saul. It's a Social Security case, and for the appellant, we have Chad Hatfield, and for the appellee, we have David Burdette. Are both those counsel on video? No, Your Honor, this is David Burdette. I'm on audio only, unfortunately. Okay, well, that's fine. So, therefore, we'll have Mr. Hatfield, who's arguing by video, from the sometimes sunny city of Kennewick. And then after that, we'll hear from Mr. Burdette, who's in Seattle. Okay, so, Mr. Hatfield, please proceed. All right, thank you, Your Honor. According to Social Security Ruling 96-8P, we look at disability cases, and we evaluate the ability to perform an 8-hour workday, 5 days per week, or a comparable 40-hour workweek schedule at one of the exertional levels, either medium, light, sedentary, heavy type work. Often those cases will come down to how much can someone lift, how much can someone stand, and rate them in these different functional exertional categories. However, in this case, fibromyalgia, we look at a specific Social Security Ruling 12-2P, noting that fibromyalgia causes flares of waxing and waning pain, malaise, and fatigue. The symptoms and signs of fibromyalgia may vary in severity over time and may even be absent on some days. So as opposed to more static type of complaints that may be of certain orthopedic conditions, these cases really hinge around the ability to persist and perform the full workday and full workweek. In 2017, this court in Revels v. Berryhill noted its frustration with the inability of administrative law judges, ALJs, to properly assess fibromyalgia symptoms, stating the following, these errors arose from an apparent fundamental misunderstanding of fibromyalgia. The ALJ failed to properly analyze Revels' fibromyalgia-related symptoms pursuant to Social Security Ruling 12-2P. Let me ask you just a moment. Is this a fibromyalgia case? Yes. This case is? Yes, that's our primary impairment. And that's been, the ALJ noted that was established, and that's been unchallenged. I apologize, but I have, at least in my notes, given me something very different. My notes also have got impairments of diabetes, hypertension, obesity, major depressive disorder, social phobia, unspecified. None of those impairments are related to this case. Then you're going to have to point to something in the record that tells me what this case is about, because I'm looking at what I understand is page 17 of the record, and what Judge Gould just read says the claimant has the following severe impairments. And he read the list, and there's no mention of fibromyalgia, and it's mostly about mental and emotional concerns. Your Honor, I don't know if we're looking at a different case here, but page 17, the ALJ listed the severe impairments, asthma, thyroid disorder, and fibromyalgia. The only other discussion was left knee osteoarthritis, which the judge found only to be severe in less than 12 months, so wasn't considering that as a severe impairment. Okay, go back to page 15 and see if we have the same administrative law judge decision. Mine says in the case of Stephanie Marie Rule. No, no, no. Who is, I think, the plaintiff in this case? Check to make sure you've got the right case in front of you, because right now we're not communicating. And take your time, because it's very important that we get on the same page. We're all learning these remote electronic techniques. We'll give you a little extra time if you need it. Your Honor, I am scheduled for two cases this week and this month. One was Rule. One was a different claim in O'Rourke. I am sorry. My scheduler put me down for this was Rule today and O'Rourke next week. This is Rule. This is Rule. And I just read you from the decision in Rule, which, in my case, the decision starts on page 15. This is the ALJ decision. And what Judge Gould read you is the list of severe impairments for Rule. I am really sorry, Your Honors. I don't know how this happened. My scheduler put me down for O'Rourke was this week and Rule was next week. I have them flip-flopped. I don't know how that happened. I'm terribly sorry about that. Well, then, we've caught you unaware, but we're the panel for Rule. We don't know anything about O'Rourke. Do you remember enough about Rule that you want to say something or are you just going to wind up giving us your papers, which were thorough? No problem there, but I'm prepared to talk and listen about Rule but not about O'Rourke. Yes, of course. Counsel, we have some time today. So if you could resolve this by taking a five- or ten-minute recess, we would do that. Otherwise, we'll consider the issues on the briefs. Your Honor, I'd appreciate that. I just need to switch gears and open up the other documents. If I could have a ten-minute recess, that would be much appreciated. I apologize. If Judge Clifton and Judge Miller don't object, the Court will recess for ten minutes. Mr. Burdett, we can't see the expression on your face, but is that going to be okay with you? That is absolutely fine, Your Honor. The expression on my face is I about had a heart attack when he started talking about fibromyalgia. Well, it's better than suffering from fibromyalgia. I suppose so. This Court stands in recess for ten minutes. This Court now resumes its session. Please be seated. Okay, well, the Court will resume the argument on Rule v. Saul. And again, we have Mr. Hatfield. Yes. Thank you, Your Honors. I apologize for the delay there. Again, I'd like to start my remarks with going back to Social Security 96-98-6P, that the test of disability is whether an individual is able to sustain eight hours a day, five days a week for work activity. It's the persistence that is an issue in this case. Again, what is left of the area and is pervaded throughout this decision is the ALJ noting that there's nothing to show the claimant is unable to do any work activity. This is also what the Dr. Lace, a medical expert upon which the ALJ relied upon, used as the standard of disability, that there's nothing that says the individual cannot perform any work activity. The ALJ relied heavily upon the opinion of Dr. Lace, which was error. First of all, Dr. Lace had missed three psychiatric hospitalizations in the record. So although it may be argued that he was the last one to review the case and therefore he's in a better position, that is not germane to this case because it is true in every single case that the medical expert who tested at the hearing will be the last person to review the records to give testimony, yet the law was clear that medical expert testimony cannot be a basis on its own to reject the opinion of a treating or examining source statement. Here, although it may be the last review, the fact that Dr. Lace had failed to see those multiple psychiatric hospitalizations undercuts his entire testimony, and it is noteworthy that although the ALJ adopted Dr. Lace's testimony, no mention was made that Dr. Lace, upon cross-examination, did agree that there would be times of absenteeism due to her mental health and that she would have off-task behavior. He agreed with that. The vocational expert at the hearing testified that the tolerance for unscheduled absenteeism, as would be the case in this situation due to anxiety disorders, has a very low tolerance. Even just a couple of days per month would preclude any type of competitive employment. Also, the ability to be off-task and unproductive, even 10% of the workday or more than that, would be work-preclusive. So here Ms. Rule contends, and the law requires no further, not that she's not able to perform any work, but that she would not be able to maintain standards required in competitive employment of attendance and being on-task during her work. To support these findings, there's an opinion of Dr. Mark's examining source. The JLJ found that there was not objective support for this. However, this is contrary to Buck v. Berryhill, where it noted that the clinical interview and mental status examinations, these are objective measures. Psychiatric evaluations may appear subjective, especially compared to evaluation in other medical fields. Diagnoses will always depend, in part, on the patient's self-report, as well as the clinician's observations of the patient. But such is the nature of psychiatry. In here, there's a long list of mental health findings made by Dr. Mark's. Notably, she was tearful during the appointment. She presented depressed with anxious mood and sad affect. She was minimally oriented. Her working memory and long-term memory were poor. She exhibited deficits in fund of knowledge and abstract thought. She was distractible. Thus, the rejection of Dr. Mark's opinion cannot be deemed specific and legitimate. At the federal court level, it was found that because the cognitive testing was not found to be impaired, that the objective testing, therefore, was not founded. However, there is a difference between not having cognitive impairments and then also having interference in the ability to sustain work due to anxiety. These are different things, being interfered with due to anxiety disorders, not being able to concentrate, and then cognitive abilities, which relate to intelligence scores. That was not a specific or not a legitimate reason for rejecting Dr. Mark's opinion. Furthermore, the same may be said of Dr. Gomez, the Ph.D., the examining physician in this case. He had many level limitations for her ability to maintain regular attendance. Her struggles with depression and anxiety, not cognitive disorder, but her struggles with depression and anxiety will interfere with her ability to complete a normal work day and work week without interruptions. She will not respond well to stress, will have difficulty responding well to performance difficulties and challenges. She's still easily triggered from past trauma and social anxiety. And so in this case, where Dr. Lace has said that these opinions were not persuasive enough for him, was due to the fact that he felt, well, if her situation was that bad, she would have needed more significant limitations. He felt that multiple therapy sessions per week would have been needed before he moved past a moderate level limitation. This is nowhere within anything required for Social Security and the requirements of the listings, but a certain personal preference or bias have you. Additionally, it should be taken within context that Dr. Lace did not realize that she had had multiple psychiatric hospitalizations. She was prescribed weekly therapy sessions, but she did attend. And the record does demonstrate that she had 20 full-blown panic attacks over the past five years with multiple numerous per week smaller panic attacks that would interfere with her ability to perform workplace functioning. Why Dr. Lace would find that having panic attacks in the workplace would not affect her ability to concentrate or stay focused or persist at her work is unexplained, and the ALJ provides no rationale for that. In fact, the administrative law judge missed several things in this record. The administrative law judge found that no treating, examining, or reviewing source found that the B or C criteria were met. This is clearly not true as the primary treating mental health provider, Daniel W. Pitts, nurse practitioner, mental health therapist who prescribed her medications and handled her therapy sessions, gave marked limitations in the B criteria of maintaining social functioning and maintaining concentration, persistence, or pace, and also gave affirmation of the C criteria. While this is not an absolute declaration that Ms. Rule meets the listings, such statements on their own is what ALJs will commonly reject for being on the ultimate issue of disability reserved for the commissioner. Instead, Nurse Pitts did what was appropriate and found limitations which would meet the criteria for meeting and equaling the listings. Furthermore, there was affirmation of the C criteria, knowing that it couldn't handle the additional demands that were placed upon her, which was shown as that she tried to do other things. She resulted in multiple psychiatric inpatient hospitalizations. So ALJ failed to address that opinion, and it just goes along the long process of not looking at what the actual standard of disability would be in this particular case. You've asked us to remand for an award of benefits, but if we were to agree with you that the decision is not supported by substantial evidence, there is some indication in the record that Ms. Rule's alcohol and substance abuse may be a contributing factor to her condition, and the ALJ didn't really consider that. But isn't that something that, if there were a finding of disability, that the ALJ would be required to consider? And isn't that a further proceeding that would be necessary that precludes our awarding benefits? Well, it is true. The judge must make a finding out that the ALJ did find that alcohol use was not material, as did the medical expert, Dr. Lace, upon whom she based her opinion. So the judge found that alcohol use is not material, which means that it doesn't affect the outcome of disability. So the ALJ had already made a finding on that particular issue, and Dr. Lace had also stated that he didn't feel it was material as well. The question, of course, is not whether there is alcohol or substance abuse. It's whether there is a supports disability even absent the exacerbation of alcohol. In this effect, the judge said it found it was not material. So I think that based on the multiple clinical examinations and upon the treating provider who did note on his form, if you look closely at it at the very bottom in bold, it does say this opinion is given without the effect drugs and alcohol, or DAA is commonly used in our cases. So that opinion, which did meet the mental health listings of both the B and the C criteria, was without the effects of drugs and alcohol. And so, therefore, an immediate award of benefits would be supported without having to further deliberations on that issue. I better not take any more time here for rebuttal unless there are other questions. Counsel, you've used up your time, but I'll give you a minute for rebuttal, extra time. Thank you. Okay, so let's hear from Mr. Burdett on behalf of the government. Thank you, Judge Gould, your honors. May it please the court, I'm David Burdett, representing the Commissioner of Social Security, Mr. Stahl, in this case. Thank you for being patient with me, too, on the matter of the telephone argument. I'll try to speak clearly and be heard and also allow the court to interject with any questions that you may have. I can't entirely agree with Mr. Hatfield in his characterization of the evidence, specifically Dr. Lace. I don't think Dr. Lace agreed at all with the proposition that she would have, that Ms. Rule would have panic attacks that would disrupt her work, and I don't think that the evidentiary record at pages 67 and 68 and 69, which are the colloquy between Mr. Hatfield and Dr. Lace at the hearing, the administrative hearing, support that. I think that the question here is whether the ALJ's interpretation of the facts is supported by substantial evidence, as it is in most of these cases. I say most because there's also the question of legal error or harmful legal error, but really everything that Mr. Hatfield has said today has been arguing about the weight to be attributed to the facts, and that is a standard that very much, as you all know, your honors, favors the trier-of-facts interpretation of the facts. Substantial evidence is more than a scintilla, but less than a preponderance. It is enough to convince a reasonable mind, and as the Supreme Court said in Arkansas v. Oklahoma and back in the Consolo case in the 60s, if there are two opposing views, both of them may be supported by substantial evidence, and that may be the case here. So the ALJ gave more weight to Lace than to some of the other doctors, and I'm thinking specifically of Marks and Gomez, because Lace had the benefit of looking at the entire longitudinal record, but it seems like Lace's analysis of the longitudinal record was just factually wrong on some key points, and specifically he seemed not to be aware of rules having to be hospitalized a number of times. Doesn't that pretty significantly undermine the ALJ's reliance on Lace's opinion? Dr. Lace was wrong in one respect, and that was the one, your honor, and that came at the end of the administrative hearing. The whole examination, or as far as Dr. Lace's appearance, the whole examination of Dr. Lace by the ALJ and by Mr. Hatfield at the hearing went from page 62 to page 71 of the evidentiary record, and I really would like the court to take a look at that before ruling. But at the end of it... Well, let's look at what the ALJ himself said, and I'm looking here, I guess, at ER 23. This is within the ALJ's decision. Got a sentence that starts out near the top of the page. Along these lines, Dr. Lace indicated, based upon questioning by the claimant's representative, that although there could be days in which the claimant would not be able to attend work due to her anxiety, a finding that this would be so pervasive as to preclude her ability to engage in any activity is inconsistent with the fact of the record, so on and so forth. And I was kind of stopped in my tracks as I read that, because I don't think the standard is whether it would preclude her ability to engage in any activity. The question is whether could she hold a job. And as Mr. Hatfield noted during his presentation, the vocational expert said if she had these unscheduled absences, yeah, that would be hard to hold a job. And I don't see Dr. Lace saying, well, no, she's not going to have those unscheduled absences. He seems to be saying, and the ALJ seems to be hearing him say, that, yeah, there might be days when she wouldn't be able to attend work due to her anxiety. So it's not just, as you've argued to us, let's go look and see what Dr. Lace said. I mean, the ALJ himself picked up on this concern about whether Ms. Rule would be able to get to work every day and seems to suggest that, well, maybe she won't. Isn't that a problem? Your Honor, with respect, one thing is right, and I'm going to disagree with another thing, if that's okay. No, that's your job. Yeah, please do. I want to know what I should be listening to. Yeah. Any activity is not the standard. That is correct. Any activity is not the matter at issue. The matter at issue is whether or not she can perform work that exists in significant numbers in the national economy. So we agree on that. But I think that the use of any activity in the ALJ's long sentence there at the top of 23 is cured by the fact that the ALJ doesn't rely on inability to do any activity in the findings. In fact, he makes findings, the ALJ makes findings that are very detailed about what her residual functional capacity was, and I think that those specific findings cure any error, you might say, or any implication that the ALJ relied on an improper standard of any activity. So that is as to that point. On the other, I guess I just disagree with the characterization that Mr. Hatfield has tried to put forth about what Dr. Lace said. And I think that Dr. Lace was presented on cross there by Mr. Hatfield with two pretty long and difficult to parse questions and did not say that, oh, yeah, she would miss work from time to time because of panic attacks or anxiety attacks. I don't think he said that. So that is my response with regard to that. Well, my question is, the ALJ seemed to think he might have said that. I mean, I was reading from what the ALJ said. And I get your point. I'm not trying to debate this. I get your point with regard to the RFC. But this raises a somewhat different issue, which is that ordinarily, yes, she might have the capability to do all the various things. But if, in fact, as the vocational expert appeared to concede, she's going to have unscheduled, unexpected absences. What, a couple times a month? I've forgotten exactly what the VE question was, and it will speak for itself. But that's kind of a separate problem from what her ordinary capacity would be. It's the problem that the employer isn't going to tolerate somebody who unexpectedly doesn't show up someday more than once in a blue moon. And so I get your reference to the RFC, but I don't know that it speaks to the question of the unexpected absences. Well, that's correct, Your Honor. If, in fact, she had that many unexpected absences, then, yeah, she can't do those jobs. We'll concede that. Now, the matter is, was the ALJ's interpretation of the factual record reasonable that she didn't? And we would respectfully submit that it was, based on looking at Dr. Latham's testimony. Not perfect, but a medical expert who gave him a pretty good opinion. The other medical evidence, Dr. Pirco, who didn't really appear in the briefing because Mr. Hatfield waved argument about her physical impairment, and her activities and consistency of her statements. And respectfully, we think that it was. We think that the case was supported, that the ALJ's reasoning in the administrative decision was supported by substantial evidence. The other piece I want to inject to make sure you have some opportunity to respond to it has to do with the, I guess, the ranking of witnesses. I mean, the regulations clearly indicate that certain medical experts may count more than others. In this case, we have Dr. Lace, who's non-examining, as compared with examining Dr. Marks, and I think it's Dr. Gomes. And then, of course, there's a treating nurse practitioner who gets in his own category. Why is it that the ALJ was entitled to put greater weight on the non-examining psychologist, as opposed to the examining psychologist who was hired by the state? So it's not like it's a plaintiff's or claimant's own person. Why shouldn't more weight be placed on the examining doctors? You're correct about all of that, Your Honor. At the time that the claim was made, the regulations said that ordinarily examiners would get more weight, generally, than a non-examining medical expert or state agency doctor. However, under all these courts' familiar cases, the ALJ is always allowed to prefer one doctor, whether it be an examiner or a non-examiner, over another if there's a conflict, as long as the ALJ cites specific and legitimate reasons for why he doesn't prefer one particular doctor, in this case, Marks and Gomes. And the ALJ did that here. He said that the findings about attendance and communication from Dr. Marks were not consistent with the exam, that it wasn't well-developed, and that it was conclusory and submitted on a checkbox form without a lot of explanation. And that's been approved by this court in cases going back at least to Crane v. Shalala in 1996. With regard to Dr. Gomes, the ALJ said the extreme findings of Dr. Gomes were not consistent with her activities in child care, and they weren't consistent with things that she went and did. In August of 15, the one exam that Dr. Gomes made was in August of 15, and he said she would struggle to attend unfamiliar places and meet unfamiliar people. And then in March of 16, she went back and forth between Washington and California. So that cannot have been right. So the ALJ cited some specific reasons, and respectfully, I characterize them as legitimate. I know Mr. Hatfield would differ, but specific and legitimate reasons for rejecting Dr. Marks and Dr. Gomes, even though they were examiners. And that's well within the universe of what is allowed under the regulations and under this court's rulings about what a trier of fact can do. Is that responsive? It is. Thank you. Okay, thank you, counsel. We'll now hear a brief rebuttal from Mr. Hatfield. Thank you. So I go back to just the first statement made about how Dr. Lace wasn't made aware of the missed psychiatric hospitalizations to the end of his testimony, and I think that's even further support for finding him there. Dr. Lace had given the equivocal bit. You know, he's already equivocated and said, yeah, she might have some missed days of work. And this was without knowing that there was multiple psychiatric inpatient hospitalizations that occurred. That only gives more support that Dr. Lace was off base and gives more support for Dr. Marks and Dr. Gomes and Dr. Pitts who said there'd be unscheduled absenteeism. And so when we look at those things, it's not just that it's a checkbox form because there were lots of mental status examination findings, which I said were subjective findings, but we look at the rest of the record of these inpatient hospitalizations and anxiety attacks, and that gives it support. The vocational expert not only said missed days of work but also said that the person needed to leave their workstation outside of regularly scheduled breaks for 20 minutes twice a day would preclude competitive employment. That's what these panic attacks would do. And so Dr. Pitts gave that opinion for off-task behavior specifically. So I think the record, how things, activities of daily living and all the examining treating sources combined together do show that support for unscheduled absenteeism and off-task behavior. And thank you for the additional time for rebuttal. Okay, you're welcome. Stacey, the case of Rule v. Saul, 235618 shall now be submitted.
judges: Gould, Clifton, Miller